## Case No. 2,709.

CHUBB et al. v. SEVEN THOUSAND EIGHT HUNDRED BUSHELS OF OATS.

[26 Law Rep. 492.]

District Court, S. D. New York. June 16, 1864.

LIABILITIES OF COMMON CARRIERS—VARYING BILL OF LADING—CUSTOM AND USAGE.

[1. Where the loss of a portion of a cargo is caused by a "danger of navigation," within the meaning of that term in a bill of lading exempting the carrier from liability for a loss so occasioned, the carrier is entitled to freight upon the portion of the cargo actually delivered.]

[2. The general usage and custom, in the transportation of goods by water, to stow them under deck. annexes to a clean bill of lading; and carriage on deck is such a violation of the contract as will render the carrier liable for loss by a "peril of the sea," notwithstanding that the bill of lading exempts the carrier from liability for loss from such a cause.]

[3. This legal import of the bill of lading implied by the general custom may be varied by proof of the custom of a particular trade, and the contract then withdrawn from the operation of the general rule requiring carriage under deck.]

[Cited in The William Gillum, Case No. 17,-693.]

[In admiralty. Libel by John H. Chubb and others against a quantity of oats (Louis Renaud, claimant).]

Mr. Van Santvoord, for libellants.
Mr. Bulkely, for claimant.

SHIPMAN, District Judge. This suit in rem is instituted to recover freight, at eight cents per New York bushel, on 7,800 bushels oats. transported on the libellants' boat, Mary Eva, from St. Antoine, Canada East, to New York, on account of Louis Renaud, of Montreal. A larger quantity of oats was shipped, as appears by the bill of lading, and not denied; but the excess over 7.800 New York bushels was lost overboard during a heavy blow on Lake Champlain. The libellants now seek to recover freight on the quantity actually delivered, and also demurrage for detention of their boat in New York, in consequence of the failure of the claimant's agents to discharge her in proper time.

The bill of lading was. so far any question before the court is concerned, in the usual form. The contract was to carry, and deliver in good order. "the dangers of navigation excepted." I think the proofs establish the fact, that the loss did occur from the dangers of navigation, and is therefore within the exception of the bill of lading. and it would follow that the libellants are entitled to recover their freight money on the quantity delivered, if there were no other question in the case. But the claimant resists this claim, and insists that the value of the oats lost should be first deducted, on the ground that they were stowed on deck in violation of the contract contained in the bill of lading, and that this departure from the contract was the occasion of the loss. The claimant also resists the demand for demurrage.

The bill of lading, under which the oats were shipped, was what is well known in law as a clean bill. It is well settled that the general usage and custom, in the transportation of goods by water, to stow them under deck, annexes to such a contract the condition, as the general rule, that they shall be so carried. If they are carried on deck, it is deemed a violation of the contract; and a loss occasioned thereby, although immediately produced by perils of the sea, falls upon the carrier. The Waldo [Case No. 17,-056]; The Peytona [Id. 11,058]; The Paragon [Id. 10,708]. This is the rule which prevails wherever the maritime law is administered. The carrier can, of course, exempt himself from this liability by obtaining the express consent of the shipper. No express consent of the shipper has been proved in the present case. It is, however, insisted that a custom of this particular trade, to stow goods of this description on deck, has been clearly proved; and that the legal effect of this local custom is to relieve this contract from the operation of the general rule. The evidence in support of this custom is objected to by the claimant, on the ground that proof of such a usage is inadmissible to vary the well-known legal import of this contract. This is an important question, and demands an attentive consideration. In deciding this question, it must not be forgotten that this obligation of the master to stow the cargo under deck, does not rest upon any express provision in the bill of lading. That is usually silent on the subject. Neither is the obligation founded upon any legal construction of the terms of the instrument. It is an implication of law drawn from a well-known and general commercial usage or custom. The parties, where they enter into a contract of this character, are understood to recognize the usage, and to include its conditions in the unwritten terms of their agreement. Though the bill of lading is silent on the subject of the place of stowage of the articles named in it, whether in the hold or on deck, the eye of the law reads in every such bill the stipulation that they are to be stowed in the former. The obligation rests on the usage or custom of the maritime world, to which the shipper and carrier are presumed to be consenting parties, and which the law attaches to the instrument itself, where it is silent on the subject. This silence is a recognition of the usage and the rule founded upon it, and binds the parties as firmly as an express and formal stipulation. The Peytona [supra]; The Waldo [supra]; The Paragon [supra]; Vernard v. Hudson [Case No. 16,921].

The question then is presented—Can that part of the legal import of the bill of lading. which is implied by law from the general custom, be varied by proof of the custom of a particular trade, and thus with-

draw the contract from the operation of the general rule requiring the cargo to be carried under deck? On this question, the case of The Paragon, above cited, is an authority in point. In that case, Judge Ware says: "It is not denied that such a custom may exist in a particular trade, as well as authorize the master to carry a part of his cargo on deck, without subjecting himself to responsibility for its loss, or any damage it may sustain from dangers of the seas, in being thus exposed." He also adds, after referring to the French Ordinance de la Marine, "In our law, the rule requiring the cargo to be safely stowed under deck, does not stand upon any express text of any act of the legislature, but upon the authority of general usage and custom. A rule of law that is established by custom may be repealed, or restrained by custom." On the nature of the proofs which should be required to establish a special custom of a particular trade, in conflict with the general rule of the maritime law, the same learned judge remarks: "But the general rule being founded on the custom of the country, universally known, and having the force of a general law, he who would exempt himself from its obligation, by a special local custom, is bound to prove the local custom by clear and conclusive evidence. Because the legal presumption is, that every contract is entered into with the understanding and intention of the parties that their rights under it are governed and determined by the general law. A local custom, in order to be binding on the parties and withdraw their contracts from the application of the common law, must be so generally known and understood, that it may fairly be presumed that all persons engaging in that particular trade are acquainted with it, and assenting to it. The presumption, then, will be that they form their engagements with a silent reference to the custom. And the custom, to be obligatory, must not be a loose practice, but precise, definite and certain, so as to supply the place of the general law in the given case, and be capable of being applied to the contract, and defining and fixing the rights of the parties under it. Such a custom, where it is established, and so generally known and recognized that the parties are presumed in their engagements tacitly to refer to it, applies itself to the contract, and forms, as it were, the complement to the terms in which the obligation is expressed by the parties, and, within its proper sphere, is equally binding with the general law." I have cited at length from this opinion, in the case of The Paragon, not because it is an isolated authority, but for the reason that it states the law on this point with singular clearness and accuracy. Judicial decisions to the same effect are abundant. It is well remarked by Hosmer, C. J., in Barber v. Brace, 3 Conn. 13, that the doctrine is "trite and familiar," that "a commercial usage, having existed a sufficient length

of time to have become generally known, and to warrant a presumption that contracts are made with reference to it, is evidence of the intention of the parties, and illustrative of their agreement." Nearly the same language is held by the court in New York in Smith v. Wright, 1 Caines, 43. In both of these cases, the question was one of liability for loss of goods stowed on deck. The general doctrine of the admissibility of parol evidence to prove the existence of usage or custom to vary the effect of contracts, is now well settled, both in the English and American courts, and has been repeatedly applied to the contract contained in a clean bill of lading. 1 Conk. Adm. p. 233, and cases there cited. It is true that Mr. Justice Story, in the case of The Reeside [Case No. 11,657], makes some trenchant remarks on the subject, but they are levelled at the abuse, rather than the existence of the doctrine. He concedes the principle, but energetically protests against extending it, so as to embrace "loose and inconclusive usages and customs."

But it is objected that the admission of parol evidence to prove the existence of the custom, where the contract of lading is in writing, contravenes the well-known rule that such evidence is not to be received to vary the terms of the written instrument. But evidence of usage or custom is never deemed within this rule. Renner v. Bank of Columbia, 9 Wheat. [22 U. S.] 581; 1 Smith, Lead. Cas. (5th Am. Ed.) 682; 1 Greenl. Ev. § 292. The case of Creery v. Holly, 14 Wend. 25, is relied on, as sustaining the objection to this evidence. But in that case the question arose not on objection to evidence of a custom, but to evidence of a parol agreement, that the goods might be carried on, instead of under, deck. The opinion of the court is expressed in the following terms: "It is true that nothing is said in the bill as to the manner of stowing away the goods—whether on or under the deck: but the case concedes that the legal import of the contract, as well as the understanding and usage of merchants, impose upon the master the duty of putting them under deck, unless otherwise stipulated; and if such is the judgment of law upon the face of the instrument, parol evidence is as inadmissible to alter it as if the duty was stated in express terms. It was a part of the contract." And, again: "If the implied obligation of the master in this case, arising out of the conceded construction of this bill of lading, may be varied by parol testimony, I do not see how any other stipulation included in it could be sustained in an offer to impeach it in the same way. Following the decisions of the federal courts, we have already suggested that the obligation of the master to stow the goods under deck, is not drawn by construction from the instrument itself, but is an implication of law springing out of the ordinary course of business. This implication of law rests upon general custom, and not upon

judicial construction of the written contract. The Peytona [supra]; Vernard v. Hudson [supra]. In the latter case, Mr. Justice Story remarks: "I take it to be very clear, that, where the goods are shipped under a common bill of lading, it is presumed that they are shipped to be put under deck, as the ordinary mode of stowing the cargo. This presumption may be rebutted, by showing a positive agreement between the parties; or, it may be deduced from other circumstances, such, for example, as the goods paying deck freight only. The admission of proof to this effect is perfectly consistent with the rules of law; for it neither contradicts nor varies anything contained in the bill of lading, but it simply rebuts a presumption arising from the ordinary course of business." In that case the bill of lading was in the common form, and a witness was admitted to prove a parol agreement to carry the goods on deck. It is true that the judge, in his comments upon the evidence, incidentally remarks that if such an agreement had existed, "one of two things ought to have occurred, either that mere deck freight should be payable, or that there should have been some written memorandum on the bill of lading, to repel the inference from a full freight being stipulated for." But these latter remarks evidently refer to the preferable character of a written memorandum, and the bearing of its absence on the probability of the existence of such an agreement as that set up, and not to the exclusion of parol evidence of the agreement itself; for he had just previously stated that proof of such an agreement "neither contradicts nor varies anything contained in the bill of lading." But it is not essential, in deciding the case now before the court, to attempt to reconcile the principle laid down in Creery v. Holly, with other cases involving the precise point there determined; or, if it shall be deemed in conflict with them, to go into the inquiry as to which lays down the true doctrine. If that case conflicts with those here cited from the federal courts, we should feel called upon to follow the rule held by the latter. As we have already stated, proof of usage or custom, with reference to which parties are presumed to have entered into their contracts, is, under the law as declared by the courts of the United States, clearly admissible, as to their extent and scope, upon all matters which are not expressed in terms or evolved by construction. And especially where the law attaches conditions to a contract founded, not on the terms of the agreement, but on general custom, proof of a different custom of a particular trade may be given to show that the general custom does not apply to that trade. Indeed, such proof merely shows that, so far as that particular trade is concerned, the general custom does not exist, and therefore no presumption of law can be founded upon it.

We now come to the application of this doctrine to the present case. It is contended by the libellants that they have conclusively proved a clear, well-settled and uniform usage of the particular carrying trade in which this contract had its origin, in conformity to which goods of this description are stowed on deck in bins, as well as under deck. The evidence supports this claim. The route over which this trade passes, after leaving the St. Lawrence river, is by the Chambly river, the Chambly canal to Lake Champlain, down the latter to Whitehall, and from thence by the Champlain canal to the Hudson river, and by the latter to Albany and New York, the usual ports of destination. Owing to the shallow water of the canals, it is always necessary, when a full load is taken, to lighter the boats in passing through them, and this is done by removing the deck load, which is put in bins for that purpose, and replacing it when the deeper water is reached. This is the only way the business can be made remunerative to the carrier. The claimant in this case has long been engaged in shipping grain, including oats, over this route, and is chargeable with knowledge of this uniform usage—a usage which rests on the necessities of the trade as affected by the limited depth of water over the artificial portions of the route. By this arrangement of bins on deck the carrier is able to transport the commodity at less rates of freight than could possibly be done, if he could take only what he could stow under deck. Thus the practice inures to the benefit of the shipper as well as the carrier, and the custom has become uniform and established with the consent and acquiescence of both parties, until it has assumed a clear and well defined usage of the trade. This usage being thus shown by clear proof, it follows that the general custom of the maritime world, by which common bills of lading are understood to import that the goods named in them are to be carried under deck, has no application to this particular trade, and such bills of lading therein are relieved from its operation.

The accident by which a portion of the cargo was lost, occurred in a gale on Lake Champlain, while the libellants' boat was, with others, in tow of a steamer, the usual mode of passing this lake. The bins in which the deck load was contained, appear to have been built in the ordinary manner, staunch and strong; but as the steamer turned Cumberland head, to go into Plattsburg, to avoid the violence of the gale, the boats she had in tow rolled heavily in the trough of the sea, striking against each other with violence, when one of the bins of the libellants' boat gave way, and a portion of the cargo was lost overboard. On a review of the whole evidence on this point, I am satisfied that the loss must be attributed to the perils or dangers of navigation, and is therefore within the exception in the bill of lading. The burden of proof on this point, as

well as that touching the existence of the particular custom, is on the libelants, and I think they have made a clear case on both. The libellants are also entitled, on the proofs, to fourteen days' demurrage. As to the rate of demurrage, I am not so clear. The testimony of the libellants on this question is confined mainly to one witness. He evidently states the highest rate. On the whole, I have fixed upon the rate at twenty dollars per day. As there is no serious dispute as to the quantity of oats delivered, or the rate of freight, or the number of days of detention, I see no occasion for a reference. Let a decree, therefore, be entered for the libellants for $624 freight, and $280 demurrage, making in all $904, with interest from December 16, 1861, the date of filing the libel.